[Cite as *State v. Rhines*, 2012-Ohio-3393.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                       :          C.A. CASE NO.    24417

v.                                               :          T.C. NO.    10CR809

ANTWAN RHINES                                    :          (Criminal appeal from
                                         Common Pleas Court)

    Defendant-Appellant                      :

                                                 :

· · · · · · · · · ·

**O P I N I O N**

Rendered on the ___27th___ day of ____July____, 2012.

· · · · · · · · · ·

R. LYNN NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

DANIEL F. GETTY, Atty. Reg. No. 0074341, 46 E. Franklin Street, Centerville, Ohio 45459
    Attorney for Defendant-Appellant

· · · · · · · · · ·

DONOVAN, J.

{¶ 1}    Defendant-appellant Antwan Rhines appeals his conviction and sentence for

aggravated vehicular homicide, in violation of R.C. 2903.06(A)(2)(a), a felony of the third degree; three counts of vehicular assault, in violation of R.C. 2903.08(A)(2)(b), all felonies of the fourth degree; one count of receiving stolen property, in violation of R.C. 2913.51(A), a felony of the fourth degree; and one count of failure to stop after an accident, in violation of R.C. 4549.02, a misdemeanor of the first degree. Rhines filed a timely notice of appeal with this Court on January 3, 2011.

{¶ 2}   The basis for the instant appeal occurred on December 12, 2008, when a stolen Chevrolet Malibu driven by Rhines crashed into two vehicles, a Toyota Sienna minivan and Pontiac Grand Prix, after running a red light at the intersection of South Main and Washington Streets in downtown Dayton, Ohio. The driver of the Grand Prix, Dwayne Bullock, died as a result of injuries sustained in the accident. The remaining three passengers: Bullock's wife, Dara; Bullock's brother, Joseph Bullock; and Joseph's fiancee (now wife), Amanda, sustained serious injuries requiring long term medical treatment. The driver of the Sienna, Tammy Dolphin, did not suffer any injuries in the collision.

{¶ 3}   After crashing into the two vehicles, Rhines fled the scene of the crash on foot and was apprehended by Dayton Police Sergeant Mark Ponichtera at the intersection of 5th Street and Main, a short distance from the accident. Sgt. Ponichtera testified that Rhines was walking with a pronounced limp when he was apprehended. Rhines also met the description of an individual observed climbing out of the stolen Malibu and fleeing the scene of the crash.

{¶ 4}   On May 5, 2010, Rhines was indicted for aggravated vehicular homicide, three counts of vehicular assault, one count of receiving stolen property, and one count of

failure to stop after an accident. At his arraignment on May 25, 2010, Rhines pled not guilty to all of the counts in the indictment. After a five day jury trial beginning on October 18, 2010, and ending on October 22, 2010, Rhines was found guilty of all counts in the indictment. On December 30, 2010, the trial court sentenced Rhines to five years in prison for the aggravated vehicular homicide, eighteen months in prison for each count of vehicular assault, eighteen months in prison for receiving stolen property, each of those counts to run consecutive to one another, for an aggregate term of eleven years in prison. The trial court sentenced Rhines to six months in prison for failure to stop after an accident, but ordered the sentence to run concurrent with the other counts. The trial court also suspended Rhines' drivers license for twenty-five years.

{¶ 5}  It is from this judgment that Rhines now appeals.

{¶ 6}  Rhines' first assignment of error is as follows:

{¶ 7}  "JUROR MISCONDUCT OCCURRED DURING JURY DELIBERATIONS TO THE DETRIMENT OF DEFENDANT, AND AS SUCH, DEFENDANT WAS DENIED A FAIR TRIAL."

{¶ 8}  In his first assignment, Rhines contends that the trial court erred by allowing members of the jury to takes notes during the trial. Rhines further argues that the trial court erred when it allowed the jurors to use their notes as substantive evidence during deliberations. Rhines asserts that this occurred because the trial court failed to instruct the jury regarding the use of their notes during deliberations.

{¶ 9}  A trial court has the discretion to either permit or prohibit note taking by jurors. *State v. Waddell*, 75 Ohio St.3d 163, 1996-Ohio-100, 661 N.E.2d 1043. Rhines

complains that the jurors should not have been allowed to take notes, citing general concerns over the potential for distracting jurors from concentrating on witnesses and the evidence. Rhines argues that the facts presented at trial were relatively uncomplicated. Thus, Rhines asserts that it was unnecessary for the jurors to take notes. Rhines, however, failed to object to the trial court's decision to permit note-taking by jurors at any point during trial. By failing to object at trial, Rhines has waived all but "plain error." *State v. Waddell,* 75 Ohio St.3d at 166. Plain error does not exist unless but for the error the outcome of the trial clearly would have been otherwise. *State v. Wickline*, 50 Ohio St.3d 114, 552 N.E.2d 913 (1990); *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978).

{¶ 10} Initially, we note that there is no requirement that a case be deemed "complicated" before jurors are permitted to take notes. Nevertheless, we note that the record establishes that over twenty witnesses testified during the course of the five-day trial. In our view, the large number of witnesses who testified coupled with the length of the trial supports the trial court's decision to permit the jury to take notes, and the court did not abuse its discretion in this regard. Additionally, Rhines has failed to establish that but for the trial court's decision to permit note taking by the jurors, the outcome of the trial would have been any different.

{¶ 11} We further note that, contrary to Rhines' assertion in his merit brief, the trial court did properly instruct the jury regarding note taking and its use of said notes during deliberations. During its preliminary instructions to the jury immediately prior to the beginning of the trial, the trial court instructed the jury as follows:

The Court: During this trial the court will permit the jurors to take

notes. If you desire to do so, you may do that. No juror is required to take notes. The taking of notes is entirely a matter of personal choice for each juror. The jurors who choose not to take notes must not be influenced by those who do take notes. The fact that the notes taken by a juror support his or her recollection in no way makes his or her memory more reliable than that of other jurors who do not take notes.

Notes are merely a memory aid, and must not take precedence over your independent memory of the facts. Do not let the taking of notes divert your attention from what is being said or is happening at the courtroom during the trial. Some persons believe that taking notes is not helpful because it may distract a person's attention and interfere with hearing all the evidence. All notes are confidential for the consideration of that juror only. Each note taker will leave his or her notes on the chair during breaks and at the end of the day will be collected by the Bailiff. When deliberations take place you will be permitted to take your notes into the jury room and use them as a memory aid. All notes will be returned to the Bailiff for destruction at the time that the jury is discharged.

{¶ 12} The preliminary instruction provided by the trial court mirrors the language set forth in Ohio Jury Instruction-CR 401.19 regarding note taking by jurors during trial. Accordingly, the trial court properly instructed the jury regarding its ability to take notes during the trial.

{¶ 13} Lastly, Rhines asserts that the jurors improperly used their notes during deliberations by sharing the contents of their notes with one another. Thus, Rhines argues that the trial court erred when it overruled his motion for new trial based upon his claim of juror misconduct with respect to the alleged sharing of notes taken during trial. With the exception of his unsupported allegation that jurors improperly shared and compared their notes during deliberations, Rhines did not adduce any evidence in the record which establishes that the jurors who took notes shared the contents of their notes with other jurors. We also note that Rhines failed to attach any affidavits to his motion for a new trial which support his contention that the jurors acted improperly. Simply put, there is no evidence of how the jurors used their notes during deliberations, if, in fact, any notes were even taken. Accordingly, the trial court did not err when it permitted the jurors to take notes during the trial after providing the jury with the proper preliminary instruction taken verbatim from OJI-CR 401.19.

{¶ 14} Rhines' first assignment of error is overruled.

{¶ 15} Rhines' second assignment of error is as follows:

{¶ 16} "THE TRIAL COURT PREJUDICED DEFENDANT THROUGH ITS IMPROPER USE OF THE DYNAMITE/*HOWARD* CHARGE TO THE JURY."

{¶ 17} In his second assignment, Rhines argues that the trial court erred when it gave a dynamite/*Howard* charge to the jury after learning that the jury was deadlocked. *State v. Howard*, 42 Ohio St.3d 18, 537 N.E. 2d 188 (1989). Specifically, Rhines asserts that the trial court violated his right to a fair trial by coercing an otherwise deadlocked jury into rendering a guilty verdict.

{¶ 18}   The record indicates that prior to giving the dynamite charge to the jury, the trial court asked both parties if they agreed with the court's decision to provide the supplemental *Howard* instruction to the jury.  Both parties agreed on the record, and the trial court subsequently gave the dynamite charge to the jury in open court.  Neither the State nor the defense objected to the instruction as provided by the trial court to the jury.

{¶ 19}   By acquiescing to the trial court's proposal to submit the dynamite charge to the jury, Rhines waived any error made by the trial court regarding the charge and cannot now complain that he was prejudiced.  Furthermore, we note that the jury had been deliberating for over eleven hours when the instruction was given, hardly premature under such circumstances.

{¶ 20}   Rhines' second assignment of error is overruled.

{¶ 21}   Rhines' third assignment of error is as follows:

{¶ 22}   "DEFENDANT'S   CONVICTION   IS   AGAINST   THE   MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 23}   In his third assignment, Rhines argues that his conviction is against the manifest weight of the evidence.

{¶ 24}   As this Court has previously noted, in a weight of the evidence challenge, an appellate court:

> "[R]eview[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed

and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175." *State v. Pierre,* 2d Dist. Montgomery No. 18443, 2001 WL 220239 (March 2, 2001).

**{¶ 25}** Although *Thompkins* explicitly permits this Court to consider credibility when confronted with an argument that the verdict is against the manifest weight of the evidence, such consideration is not unbounded. We have explained the limited role of an appellate court in reviewing issues of credibility in weight of the evidence challenges as follows:

Because the factfinder, be it the jury or *** trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion. Therefore, although this distinction is not set forth in *Thompkins*, *supra*, we conclude that a decision by a

factfinder as to which testimony to credit, and to what extent, is a decision that is entitled to greater deference than the decision as to how much logical force to assign an inference suggested by that evidence – in short, how persuasive it is. *State v. Pierre,* 2d Dist.   Montgomery No. 18443, 2001 WL 220239 (March 2, 2001).

**{¶ 26}**   During the trial, the key issue before the jury was whether Rhines was driving the stolen vehicle which caused the accident and resulted in the death of Dwayne Bullock, as well as serious injuries to three other people in his vehicle.   In this regard, the State principally relied on the testimony of David Humphrey, a limousine driver who was present in the parking lot of a McDonalds Restaurant directly across from where the collision occurred.   Humphrey testified that immediately prior to the collision, he observed a Chevrolet Malibu with two individuals in the front seat speeding down Washington Street at approximately sixty-five to seventy miles per hour.   Humphrey stated that the Chevrolet ran a red light and then crashed into a white minivan and then hit the Pontiac driven by Dwayne Bullock which brought all of the vehicles involved in the collision to a stop.   In the initial moments after the crash, Humphrey stated that he observed a black male wearing dark pants, a brown jacket, and a knit hat climb out of the driver's side of the vehicle and begin walking towards the back of the BP gas station on the opposite side of the street.   Humphrey testified that the man, later identified as Rhines, was walking quickly but with a pronounced limp.

**{¶ 27}**   Humphrey testified that he got back in his limousine and tried to follow the man fleeing the scene of the collision.   Humphrey called 911 to report the collision, and the

fleeing driver. Humphrey gave the 911 operator a description of the man based on the clothes he was wearing. The operator told Humphrey to go back to the scene of the collision and to stop following the suspect. Humphrey testified that he followed the man for a moment longer, but eventually returned to scene of the collision and informed the emergency personnel there of what he had witnessed. Upon returning to the scene, Humphrey observed a black male, later identified as Runyon Yarborough, lying next to the passenger side of the Chevrolet being attended to by emergency personnel.

{¶ 28} After observing Rhines walking/limping northbound on Main Street and taking him into custody, Sgt. Ponichtera arrived at the scene of the collision. Based on his clothing, Humphrey identified Rhines as the man he observed climb out of the driver's side of the Chevrolet and leave the scene by walking northbound on Main Street. We note that although Rhines' DNA was not found in the Chevrolet, he was observed by Humphrey to be the first individual to climb out of the vehicle on the driver's side within seconds of the collision. Humphrey's testimony clearly supports the State's theory that Rhines was the driver of the stolen Chevrolet which caused the collision that took Dwayne Bullock's life.

{¶ 29} It is undisputed that Yarborough's DNA was found on the driver's side airbag. Nevertheless, the State presented evidence that the passenger side door would not open, thus requiring Yarborough to climb out the driver's side door and providing an explanation as to how his DNA was deposited on the deployed airbag. Mary J. Cicco, a forensic expert from the Miami Valley Regional Crime Lab, testified that the absence of Rhines' DNA from the deployed airbag on the driver's side did not preclude him from being the driver of the vehicle, noting that no DNA was deposited on the airbag deployed on the

passenger side.

{¶ 30}    Upon review, we conclude that Rhines' conviction is not against the manifest weight of the evidence.   The credibility of the witnesses and the weight to be given their testimony were matters for the jury to resolve.   Rhines presented no evidence at trial. Instead, Rhines attempted to undermine the State's case by discrediting the testimony of the various individuals who witnessed all or part of the collision and its aftermath.   Specifically, Rhines attempted to establish that Yarborough was the driver of Chevrolet.   We cannot say that the jury lost its way simply because it rejected Rhines' contention that Yarborough was the driver.   Humphrey observed the collision and positively identified Rhines as the individual he saw climb out the vehicle on the driver's side and flee the scene.

{¶ 31}    We note that witness Michael Davis testified that he did not see the collision occur nor did he arrive at the scene until three to five minutes after the crash.   Upon arriving at the scene, however, he observed a single black male crawl out of the driver's side of the Chevrolet, walk to the passenger side of the vehicle, and lay down on the ground.   When Humphrey returned to the scene shortly after following Rhines, he observed Yarborough laying on the ground on the passenger side of the vehicle.   As stated previously, Humphrey testified that Rhines climbed out of the driver's side of the vehicle within seconds after the crash occurred, well before Davis arrived at the scene and observed Yarborough climb out of the vehicle.   This testimony supports the State's theory that Rhines was driving the vehicle when the collision occurred because he climbed out of the driver's side of the Chevrolet first.   Having reviewed the entire record, we cannot clearly find that the evidence weighs heavily against a conviction, or that a manifest miscarriage of justice has occurred.

{¶ 32} Rhines' third assignment of error is overruled.

{¶ 33} Rhines' fourth assignment of error is as follows:

{¶ 34} "DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL."

{¶ 35} In his fourth assignment, Rhines argues that he received ineffective assistance for the following reasons: 1) defense counsel did not call any witnesses for Rhines' case-in-chief, namely an accident re-constructionist; 2) defense counsel failed to object to juror note-taking at the beginning of the trial; and 3) defense counsel failed to ask the trial court to provide a limiting instruction regarding juror note-taking.

{¶ 36} "We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley* (1989), 42 Ohio St.3d 136, * * * . Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.* Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." (Internal citation omitted). *State v. Mitchell*, 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31.

{¶ 37} An appellant is not deprived of effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic. *State v. Brown*, 38 Ohio St.3d 305, 319, 528 N.E.2d 523 (1988). The test for a claim of ineffective assistance of counsel is not whether counsel pursued every possible defense; the test is whether the defense chosen was objectively reasonable. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052. A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy. *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985). Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available. *State v. Cook*, 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992).

{¶ 38} "The failure to call an available witness whose testimony could acquit the defendant can constitute ineffective assistance of counsel. Nevertheless, there is a presumption that any challenged action on the part of defense counsel 'might be considered sound trial strategy.' Decisions regarding the calling of witnesses will often fall within the range of acceptably sound trial strategy." *State v. Johnson*, 2d Dist. Montgomery No. 16803, 1998 WL 453768 (Aug. 7, 1998), (citations omitted). The Ohio Supreme Court has recognized that whether to call an expert is a matter of trial strategy, and "the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel." *State v. Nicholas*, 66 Ohio St.3d 431, 436, 613 N.E.2d 225 (1993); see also *State v. Thompson*, 33 Ohio St.3d 1, 10-11, 514 N.E.2d 407 (1987).

{¶ 39} After a thorough review of the record, we conclude that Rhines has failed to establish that he was prejudiced by his counsel's failure to call any expert witnesses and/or

an accident re-constructionist in order to challenge the State's case. As to the DNA expert testimony, the State's forensic expert, Mary Cicco, testified that her tests would establish only that DNA was or was not present on an item, but not the manner in which it was deposited in a specific area. Cicco testified that she discovered the DNA of Yarborough on the driver's side airbag, as well as the DNA of the stolen vehicle's owner's son, Radwan Jaber. Cicco testified that Rhines' DNA, however, was not found anywhere in the vehicle. The absence of Rhines' DNA does not establish who was operating the vehicle. Cicco testified that if the airbag deployed and hit Rhines in an area of his body where he was fully clothed, then she would not expect to find a DNA transfer. Defense counsel did aptly elicit testimony from Cicco that Rhines' DNA was not found anywhere in the vehicle, while Yarborough's DNA was found on the driver's side airbag, thus permitting an inference that Rhines was not in the vehicle when it crashed or was not driving it. Such testimony was arguably helpful to the defense, and defense counsel was not deficient for failing to call its own expert in this regard.

{¶ 40} Similarly, defense counsel was not ineffective for failing to call an accident re-constructionist to testify. Initially, we note that the State presented the testimony of eyewitnesses who observed the crash as it occurred, namely Eric Suttman and David Humphrey. The witnesses were able to provide the jury with a detailed description of the crash itself and the individuals involved. Significantly, an accident re-constructionist would be unable to offer any testimony going to the heart of the case; that is, who, in fact, was driving the vehicle when the deadly collision occurred. Thus, defense counsel was not ineffective for failing to retain the services of an accident re-constructionist to testify during

trial.

**{¶ 41}** Rhines also argues that it was deficient for his counsel to fail to request a continuance in order to retain an expert DNA witness and an accident re-constructionist. We have already concluded that defense counsel was not ineffective for failing to call his own DNA expert and accident re-constructionist. Furthermore, we cannot find that counsel was ineffective for failing to request a continuance in order to retain his own expert testimony. We note that the record is not clear as to when Rhines' counsel learned about the DNA testimony, but nevertheless, the absence of Rhines' DNA was arguably exculpatory, not incriminating. Thus, any decision to proceed to trial was a matter of trial strategy. The record establishes that defense counsel vigorously cross-examined all of the State's witnesses, and Rhines fails to demonstrate how any additional preparation time and expert consultation would have changed the outcome of the case.

**{¶ 42}** Lastly, Rhines asserts that his trial counsel was ineffective for failing to object to the trial court's decision to permit the jurors to take notes during the trial. We have already found, however, that the trial court did not err when it permitted the jury to take notes. Moreover, contrary to Rhines' repeated assertion, the trial court did, in fact, provide the jury with a limiting instruction regarding the jurors' decision to take and use notes during trial and deliberations. Rhines has failed to establish that his counsel's performance fell below an objective standard of reasonableness.

**{¶ 43}** Rhines' fourth assignment of error is overruled.

**{¶ 44}** Rhines' fifth assignment of error is as follows:

{¶ 45} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN THE COURT PREVENTED DEFENDANT FROM NAMING THE WITNESS, RUNYON YARBOROUGH'S PRIOR CONVICTION FOR VEHICULAR ASSAULT."

{¶ 46} In his fifth assignment, Rhines contends that the trial court abused its discretion when it limited defense counsel's impeachment of Yarborough pursuant to Evid. R. 609(A), by refusing to permit defense counsel to elicit from Yarborough the fact of his prior conviction for vehicular assault. The trial court ruled that the "evidence [was] being used by *** the defense to show that [Yarborough's] perhaps guilty; he's the perpetrator because he's got a prior similar conviction." Alternatively, the trial court permitted defense counsel to refer to the prior vehicular assault conviction as simply, an "assault."

{¶ 47} With respect to the admission or exclusion of evidence, the trial court has broad discretion and its decision in such matters will not be disturbed by a reviewing court absent an abuse of discretion that has caused material prejudice. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88.

{¶ 48} As the Supreme Court of Ohio has determined:

"Abuse of discretion" has been defined as a attitude that is unreasonable, arbitrary or unconscionable. It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.

A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it to decide the issue *de novo*, would not have found that reasoning process to be

persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result. *AAAA Enterprises, Inc. v. River Place Community Redevelopment*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 49}   Evid. R. 609(A)(1) states as follows:

(A) General rule

For the purpose of attacking the credibility of a witness:

(1) subject to Evid. R. 403, evidence that a witness other than the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the witness was convicted.

{¶ 50}   Evid.R. 403(A) provides:

Exclusion mandatory.   Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

{¶ 51}   In the instant case, Rhines argues that the trial court should have permitted him to introduce evidence of Yarborough's prior conviction for vehicular assault.   Rhines asserts that he "simply wanted to impeach [Yarborough]'s credibility for truthfulness by introducing the fact that [he] has a prior conviction for vehicular assault," the exact same crime for which Rhines had been charged.   As stated previously, the central issue in this case was who was driving the vehicle when it crashed.

{¶ 52}   We conclude that the trial court erred when it reclassified Yarborough's

vehicular assault conviction as simple "assault". Any danger that the jury would misconstrue the prior conviction as substantive evidence that Yarborough was the driver of the Chevrolet Malibu was de minimis as Yarborough was not on trial nor under indictment. Thus, the "prejudicial impact" of this evidence was limited. There is no justification for calling the prior conviction something different that what it is. Although the new labeling of Yarborough's prior conviction was an abuse of discretion, we cannot find that it constituted material prejudice to Rhines.

**{¶ 53}** Rhines' fifth assignment of error is overruled.

**{¶ 54}** Rhines sixth and final assignment of error is as follows:

**{¶ 55}** "THE STATE'S BLATANT AND CONTINUOUS DISCOVERY VIOLATIONS CONSTITUTED PROSECUTORIAL MISCONDUCT AND DENIED DEFENDANT A FAIR TRIAL."

**{¶ 56}** In his final assignment, Rhines argues that the State committed misconduct when it failed to disclose the following evidence prior to trial, to wit: 1) evidence that the DNA of the son, Radwan Jaber, of the owner of the stolen vehicle was found inside the Chevrolet; 2) the second report filed by Officer Derric D. McDonald indicating that Rhines, not Yarborough, was the driver of the stolen Chevrolet; and 3) the second statement made to police by witness Davis.

**{¶ 57}** In analyzing claims of prosecutorial misconduct, "the touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged

misconduct, the defendant has not been prejudiced and his conviction will not be reversed. See *State v. Loza*, 71 Ohio St.3d 61, 78, 1994-Ohio-409, 641 N.E.2d 1082. In reviewing allegations of prosecutorial misconduct, we review the alleged wrongful conduct in the context of the entire trial. *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

**{¶ 58}** Initially, we note that defense counsel admitted that he and the attorneys for the State had a conference prior to trial during which defense counsel was permitted to inspect all of the State's discovery "page by page." Regarding the information in Cicco's report disclosing the presence of the Radwan Jaber's DNA in the vehicle, we find that such evidence was not probative of who was driving the Chevrolet on the night of the crash. Jaber was the owner's son, and it is no surprise that his DNA was present in the vehicle. Additionally, there is no evidence that Jaber was in the vehicle when the crash occurred. Thus, we find that the State's alleged failure to disclose the presence of Jaber's DNA in the stolen vehicle did not constitute misconduct and had no prejudicial effect on Rhines' trial.

**{¶ 59}** With respect to Officer McDonald's second report, defense counsel acknowledged learning of the second report prior to trial. Although defense counsel argued that the State was rather dilatory in disclosing the second report, he acknowledged that the late receipt of the document did not necessitate a continuance to allow for additional trial preparation. Further, defense counsel was able to cross-examine Officer McDonald extensively regarding the second report. Substantively, the reports were the same except as to Officer McDonald's conclusion regarding who was driving the vehicle. Officer McDonald's explanation for the discrepancy in conclusions was based on DNA analysis

versus witness accounts.

{¶ 60} Lastly, Rhines argues that the State committed a discovery violation when it failed to disclose to defense counsel a second statement made by witness Davis which purportedly contradicted information he provided to police in his first statement. We note that the State denied that it failed to provide defense counsel with Davis' second statement prior to trial. Even if the State did, in fact, fail to turn over the second statement, the record establishes that this was due to a miscommunication between the parties, and not any malicious intent on the part of the State. Furthermore, at the pre-trial conference where defense counsel was permitted to inspect the State's discovery, the prosecutor asked defense counsel if he was in possession of Davis' statements, and defense counsel stated that he was. The State informed the trial court that it assumed that defense counsel was referring to both of Davis' statements. Defense counsel stated that he agreed with the State's interpretation of their earlier conversation. Moreover, it appears that defense counsel was able to cross-examine Davis at length regarding any discrepancies between his first and second statements. Upon review, it is clear that Rhines was not prejudiced by the State's alleged failure to provide Davis' second statement to police regarding the accident.

{¶ 61} Rhines' sixth and final assignment of error is overruled.

{¶ 62} All of Rhines' assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J., concurring:

{¶ 63} I concur fully in Judge Donovan's opinion for the court. I write separately

merely to clarify my reason for concluding that the trial court's error in re-naming the witness Yarborough's Vehicular Assault felony conviction as a conviction for Assault was harmless.

{¶ 64} Rhines conceded in oral argument that the only legitimate purpose for introducing Yarborough's conviction for Vehicular Assault was to impeach his testimony, not to support Rhines's contention that Yarborough, not Rhines, was the driver of the vehicle in this case. Unless a prior felony conviction is for a crime of moral turpitude, involving dishonesty, the name of the offense does not establish any greater likelihood that the witness is a dishonest person, beyond the mere fact that the witness has committed a felony in the past. Here, in addition to the mis-named "Assault" conviction, Rhines was able to establish that Yarborough had been convicted in the past of multiple felonies. Therefore, the misnomer of Yarborough's Vehicular Assault conviction was not likely to have any impact on the jury's assessment of Yarborough's credibility. In other words, that one of Yarborough's multiple felony convictions was Vehicular Assault, not Assault, would not have done any greater damage to Yarborough's credibility in the eyes of the jury. Therefore, I agree that the error was harmless.

. . . . . . . . . .

HALL, J., concurring:

{¶ 65} I concur with the analysis in the opinion for the court, and the concurring opinion, which leads to affirming the judgment. But I differ somewhat with respect to whether the trial court erred by restricting impeachment of a witness by limiting the name of that witness's prior conviction. In my view, the trial court did not abuse its discretion by

finding that the probative value of that Evid.R. 609(A)(1) evidence was, subject to Evid. R. 403, substantially outweighed by the danger of unfair prejudice. I agree that reclassifying the offense of "vehicular assault" as an "assault" rather than simply referring to it as an "unspecified felony," could be incorrect. However, once the trial court ruled that the term "vehicular assault" would not be admissible, the name to call the offense, i.e. "assault," was agreed to by counsel. (T. 481). Accordingly, it was not error. Moreover, I agree that any perceived error about the limitation is undoubtedly harmless.

{¶ 66} Impeachment of a witness by a prior felony conviction, as permitted by Evid.R. 609(A)(1), is specifically made "subject to Evid. R. 403[.]" *Id.* Here, the defendant was charged with aggravated vehicular homicide and three counts of aggravated vehicular assault. Whether the defendant was the driver of the speeding stolen vehicle was a key issue in the case. Runyon Yarborough, who was also seen getting out of the driver's side of the car, testified that Antwan Rhines had been the driver. Normally, evidence of a prior conviction is limited to "the name of the crime, the time and place of conviction and the punishment imposed." *State v. Amburgey*, 33 Ohio St.3d 115, 515 N.E.2d 925 (1987), syllabus. But here, the defense argued that Runyon Yarborough had actually been the driver of the car.[1] *(See e.g.* T. 976) There was substantial risk that the jury, upon hearing that Yarborough had a prior conviction for vehicular assault, would conflate that testimony, which should be used only as it affects the witness's credibility, as substantive evidence of Yarborough's responsibility. Yarborough had convictions for multiple other felonies (T.

---

[1]The evidence in the record of Yarborough's conviction for a vehicular assault was insufficient to independently qualify as admissible 404(B) evidence.

882-883), so the evidentiary value of this additional one was minimal. "The decision whether or not to admit evidence under Evid. R. 609 is left to the sound discretion of the trial court * * *." *State v. Lawson*, Montgomery No. 23456, 2010–Ohio–3114, ¶ 17. Under the circumstances, I cannot say that the trial court abused its discretion. Perhaps it would have been better if the parties had agreed to refer to that offense simply as another "felony conviction," but their agreement was not error in light of the trial court's ruling.

**{¶ 67}** In the final analysis, any impact this additional felony could have had on the issue of Yarborough's credibility is undoubtedly harmless because the jury heard of his other convictions in 2009 for four counts of having weapons under disability, in 2004 for possession of cocaine, and in 2004 for improperly discharging a firearm at or into a habitation.

. . . . . . . . . .

Copies mailed to:

R. Lynn Nothstine
Daniel F. Getty
Hon. Gregory F. Singer